UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

IESHA N. HENSLEY                                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 3:17-CV-00165-DW

NANCY A. BERRYWILL, Acting Commissioner of Social Security          DEFENDANT


**<u>MEMORANDUM OPINION</u>**


Plaintiff Iesha Hensley has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that denied his/her

application for supplemental security income (SSI). Hensley applied for SSI on August 13,

2013, alleging that she was disabled as of August 13, 2012, due to scoliosis, obesity, attention

deficit/hyperactivity disorder (ADHD), depression, PTSD, personality disorder and

schizoaffective disorder (Tr. 166-169; 172-173). The Commissioner denied Hensley's claims on

initial consideration (Tr.109-112) and on reconsideration (Tr. 117-123). Hensley requested a

hearing before an Administrative Law Judge (ALJ) (Tr.125-127).[1]

ALJ John R. Price conducted a hearing in Louisville, Kentucky, on September 8, 2015

(Tr.33-76). Hensley attended with her attorney, Shannon Fauver (Tr.33 ). Hensley and

vocational expert (VE) Robert Piper testified at the hearing (Tr. 34-71, 72-76). Following the

conclusion of the hearing, ALJ Price entered a hearing decision on October 28, 2015 that found

Hensley is not disabled for the purposes of the Social Security Act (Tr.14-28). In his adverse

decision, ALJ Price made the following findings:

---

[1] On May 8, 2014, Hensley protectively filed an application for child's insurance benefits based on disability with an alleged onset date of August 13, 2102. This application was escalated for consideration with her pre-existing SSI application. (TR 14).

1. Born on July 29, 1991, the claimant had not attained age 22 as of August 13, 2012, the alleged onset date. (20 CFR 404.102, 416.120(c)(4) and 404350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since August 13, 2012, the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq*.).

3. The claimant has the following severe impairments: scoliosis, obesity, attention deficit/hyperactivity disorder (ADHD), depression, PTSD, personality disorder and rule/out schizoaffective disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she could occasionally bend, stoop, kneel, or crouch; she could occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; she should avoid extreme cold, even moderate vibration, and hazards such as unprotected heights and dangerous moving machinery; and she is capable of simple, routine one to three step job tasks with occasional, but superficial interaction with others.

6. The claimant has no past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on July 29, 1991, and was 21-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 13, 2012, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 16-27).  Hensley sought review of the hearing decision by the Appeals Council (Tr.9-10).  The Appeals Council denied her request for review, finding no reason under the Rules to review ALJ Price's decision (Tr.1-6).  The present lawsuit followed.

**The Five-Step Sequential Evaluation Process for Claims of Adult Disability.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505(a)(4), 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart P of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."[2]

---

[2] Hensley's child disability claim ordinarily would be considered pursuant to a 3-step sequential evaluation process under 20 CFR § 416.924(a), which focuses on whether the child claimant's sever impairment satisfies the criteria of

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th

---

any of the Listing of Impairments of 20 CFR 404, Subpart P, Appx 1; 20 CFR § 416.924 (d). The Commissioner would assess whether the functional limitations caused by the alleged impairments equal any of the Listings. 20 CFR 416.926a(a). *See, Marshall on behalf of D.L.M. v. Comm'r*, No. 1:16-CV-2596, 2017 WL 5514365 at *1 (N.D. Ohio Nov. 1, 2017); *Barber on behalf of D.A. v. Comm'r*, No: 1:16–CV–2436, 2017 WL 3447834 at *12 (N.D. Ohio July 28, 2017). Because the parties do not raise any arguments directly related to this 3-step process, we give it no further consideration in this opinion.

Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Issues for Review.**

Hensley first argues in her Fact & Law Summary that ALJ Price erred in finding of fact no. 4 when he found that Hensley does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1. (TR 17-19). Hensley next maintains that ALJ Price erred as a matter of law when he violated the "treating source" rule in applying the provisions of SSR 96-2p, 20 CFR § 404.1572. More particularly, Hensley argues that ALJ Price (1) failed to determine whether all of the doctors who treated her at the Portland Family Health Center, the University of Louisville Hospital, Norton Primary Care Center, Graham Chiropractic and Seven Counties Services were treating physicians as defined by SSR 96-2p and *Wilson v. Commissioner,* 378 F.3d 541 (6[th]Cir. 2004); and (2) whether any of these doctors rendered a favorable opinion about the severity of her impairments that should have been given controlling weight under the above regulation to include the Global Assessment of Functioning (GAF) scores of record.

Finally, Hensley maintains that ALJ Price in his hearing decision in finding of fact no. 5 misstated the evidence of record in two different respects. First, she maintains that throughout the hearing decision the ALJ erroneously found that she had not been hospitalized for her mental health issues when in fact Hensley had been involuntarily admitted to the hospital on August 1, 2014 following a suicide attempt. Second, Hensley maintains that the finding of ALJ Price that she stopped physical therapy because it did not "fit her schedule" was misleading when, in fact,

her full statement indicated that her prescribed psychotropic medications caused her to become so sleepy that she would miss her scheduled therapy appointments, contrary to the suggestion of the ALJ that her testimony was less than credible due to her poor motivation to seek treatment.

Because careful examination of the administrative record persuades the Court that the decision of the Commissioner is supported by substantial evidence and in full accordance with the applicable law, the Court shall enter a separate order that affirms the Commissioner and dismisses the complaint with prejudice.

# I.
## The Material Facts

The claimant, Iesha Hensley, is a single female who was born July 29, 1991 (TR 166). She stands 5'10" tall and weighs 225 pounds (TR 201). Educational records confirm that Hensley graduated from Atherton high school in Louisville Kentucky in 2011 and attended the Jefferson Community Technical College for two years thereafter without receiving a diploma (TR 37, 41, 183-84, 185-96). Her sole work history consists of a brief period of several months of volunteer work she performed at a childcare center operated by her grandmother while Hensley attended school, which ended due to her back pain and an alleged confrontation with a parent (TR 37-41).

Hensley testified to a history of complaints of back pain beginning in 2012 (TR 41-51). She attempted physical therapy for her pain in 2012 after seeking treatment on several occasions (TR 42). Although her doctors at Norton Hospital recommended that she resumed physical therapy in June 2013, Hensley testified that she did not find a way to "fit it in my schedule" due to the side effects of her medication, which she explained caused her to oversleep repeatedly and miss her physical therapy appointments. (TR 42-43). Accordingly, Hensley last attempted physical therapy in 2012. At the time of the hearing, she explained that she addressed her back

problems with stretching and chiropractic treatment (TR 43-45).  Hensley described the majority of her back pain as being located in the mid back between her shoulder blades although on occasion it also includes her lower back (TR 45).

Her back pain, Hensley explained, adversely affects her ability to stand and walk (TR 46).  She is forced to change positions when seated approximately every 30 minutes (TR 47) Hensley purchased a lumbar back brace that she wears approximately three or four days a week (TR 47-48).  She additionally takes a prescription of Baclofen along with prescription strength Tylenol (TR 48-49).  Otherwise, Hensley relies on ice, heat, stretching and massage.  (TR 49). Occasionally she requires her mother to assist her with getting out of bed and getting dressed (TR 49-50).  Hensley testified that she does not often cook, do the laundry or clean her room as a result of her concern that such activities will aggravate her pain (TR 50-51).  She related that she has days when she does not get out of bed and has fallen in the past due to her back problems and related pain (TR 51-52).

Review of the Portland Family Health Clinic medical records confirms complaints of back pain on various occasions.  (TR 291, 296-297, 302, 314, 315-16).  Diagnostic imaging of Hensley's thoracolumbar spine performed on October 11, 2012 revealed only a "mild leftward convex lumbar scoliosis," along with partial sacralization of the L5 on the left and a developmental nonunion of the posterior ring of the T12.  (TR 314, 315-316, 327).  Her treating medical provider at the Family Health Center prescribed Baclofen, 10 mg, and recommended rest, ice and physical therapy.  (TR 315).

Hensley has sought treatment in the University of Louisville emergency room in the past, but primarily for mental problems rather than her back pain (TR 52-53).  She recalled an incident approximately two years prior to the hearing in which she became unusually distraught following

the death of several family members (TR 53-54).  Hensley received ongoing mental health treatment from psychiatrist, Dr. Monica Halappanavar, at Seven Counties Services for depression during that time period.  (TR 55 five and 56).  Hensley explained that she was reluctant, however, to take the prescribed medication for depression due to the delay in its effectiveness and the possibility of severe side effects.  (TR 56).

She also received treatment at both the Family Health Clinic and Seven Counties Services for ADHD, as well as, depression.  (TR 303-05, 311, 399-483, 484-510).  Psychiatry progress notes of Dr. Halappanavar dated May 2, 2014 reveal a diagnosis of depressive disorder along with degenerative disc disease, scoliosis and chronic back pain related to developmental anomalies of the spine (TR 405-06, 509).  Hensley reported being depressed and having issues with her ability to sleep, focus, concentrate and complete tasks.  (TR 507).  Nevertheless, she was unwilling to consider depression treatment with a prescription for Wellbutrin, which she had tried in the past according to her with no perceived benefit.  Hensley was noted on that occasion to be adequately groomed, cooperative with a euthymic affect, conversant, and organized with no suicidal or homicidal ideation (Id.). Her chief complaint, however, was then noted to be ADHD, for which she had not taken any medication for the past 5-years. (TR 405-06).

Hensley returned to Seven Counties Services in July 2014 at which time she confirmed her diagnosis of ADHD along with her prior prescriptions for Adderall, which was then prescribed 20 mg, po qam.  (TR 504).  On that occasion, Hensley for the first time also talked about hallucinations and paranoia and asked the doctor if she (Hensley) had ever been diagnosed with schizoaffective disorder.  (Id.).  Despite her concerns about schizoaffective disorder, she was once again noted to be adequately groomed, cooperative, conversant and organized. Hensley

related living with her mother, but reported being limited to doing "basic chores" due to her back pain (Id.).

When Hensley returned to Seven Counties Services on September 9, 2014 she stated that she guessed she was doing okay, although her prescribed, generic Adderall medication did not seem to work as well as the non-generic. (TR 501). Hensley reported on that occasion she recently experienced really bad mood swings and crying spells that caused her to seek treatment at U of L emergency psychiatric services. She also related hearing voices that she claimed occasionally say "mean things". Otherwise she requested that her Trazodone medication be discontinued, which was done and Paxil, 10 mg, po qhs, prescribed (TR 502).

Hensley reported on October 8, 2014 that the Paxil was "working fine" that her sleep was better and that she felt rested. (TR 498). She also related that her focus was better although she still did not "feel normal" and was "drifting a lot." (Id.). While she once again presented adequately groomed and was cooperative with no apparent paranoia, Hensley nonetheless expressed vague symptoms such as thoughts/voices in her head and the belief that people were listening to her phone conversations. (Id.). Dr. Halappanavar increased her Adderall prescription to 30 mg and her Paxil was continued at the same dosage level (TR 499).

By November 7, 2014, Hensley appeared again at Seven County Services for a routine follow-up at which time she reported "having a lot of stressors in her life" such as being evicted, having no money or electricity in her home (TR 495). As before, Hensley voiced multiple vague symptoms, but denied hearing any voices telling her to hurt herself or others. (Id.) Dr. Halappanavar on that occasion diagnosed Hensley with depressive disorder, ADD, personality disorder, scoliosis, degenerative disc disease, and chronic back pain related to the developmental anomaly in her spine. (Id) Hensley subsequently reported on December 31, 2014 to the doctor

that she had received an eye exam and that the examination revealed no pathology that would cause or visual hallucinations. Hensley then claimed to hear different voices that she believed to be her different personalities.

Dr. Halappanavar reported that Hensley "seemed focused on having a diagnosis of schizophrenia." (TR 493). Because Hensley related hearing voices, Dr. Halappanavar added a prescription for Risperdal, 1 mg, po qhs. (TR 494). Hensley, however, when she returned to seven County services on May 26, 2015 reported that she was out of all of her medications and that she did not want to take the Risperdal due to potential side effects. (TR 491-492). Hensley also reported that she had stopped taking her Paxil medication two months earlier (TR 491). As of June 5, 2015, Hensley was not taking any medication (Id.).

On this final occasion on June 5, 2015, Hensley explained to Dr. Halappanavar that Hensley had traveled to Houston, Texas where she "got stuck" and could not get back to Louisville. During this time, she took herself off her Risperdal due to her concerns about potential side effects (TR 489). Hensley reported auditory hallucinations, being depressed and under stress with crying spells (Id.). Dr. Halappanavar noted that Hensley had "decompensated since [her] last visit." (Id.). Hensley requested that her prescription for Adderall be resumed at a higher dose. Her diagnosis continued to be depressive disorder, ADD, r/o psychotic disorder, personality disorder, scoliosis, chronic back pain, and degenerative disc disease (TR 490). Mental status examination results revealed on that occasion, however, that Hensley's appearance, judgment, insight, psychomotor activity, speech, affect, mood, orientation, memory, cognition, concentration, cooperation and sensorium were within normal limits (TR 490). Her thought content and her thought pattern were reported to be paranoid and disorganized. (Id.).

Hensley did briefly receive chiropractic treatment for her back pain at Graham Chiropractic on June 18, 2015 (TR 511-519). On that occasion, she complained of moderate bilateral dull, achy pain in the cervical thoracic and lumbar spine resulting in restricted movement. (TR 513-516). She related that sitting, standing, walking, and bending worsened her pain, while massage, heat and anti-inflammatory muscle relaxers helped alleviate it (TR 515). Orthopedic testing resulted in positive test results for the Nachias test, lumbar-tenderness test, Valsalva test, Bechterew sitting test and Kemp's test (TR 519). Other than treatment on June 18, Hensley's medical records contain no further reference to any other chiropractic treatment.

Hensley was treated by Dr. Afshan Kashif at Norton Healthcare on several occasions in 2014-2015. She appeared on July 2, 2014 with a primary diagnosis of back pain, obesity and GERD (TR 387) for which she was prescribed Tylenol, 500 mg and Flexeril, 10 mg (TR 389). X-rays of the thoracic and lumbar spine were obtained on July 22, 2014 at Norton Hospital and revealed only "mild scoliosis." (TR 389-91, 396). Treatment notes from July 2 indicate chronic, aching and shooting, daily, back pain in the lumbar and thoracic spine which began approximately a year earlier in 2012 (TR 392). Hensley rated her pain on that occasion at a severity level of 4/10 with her pain being aggravated by standing and bending (Id.). Nevertheless, she exhibited negative straight leg raising and 5/5 muscle strength in her extremities with only tenderness of the lumbar and thoracic spine (Id.). Otherwise, her physical examination results were all within normal limits. (Id.). Dr. Kashif prescribed Tylenol and Flexeril at that time. (TR 393).

She returned on October 30, 2014 with a continuing diagnosis of subacute back pain along with GERD (TR 520). Her medications then included Flexeril 10 mg as needed, Prilosec 20 mg once daily, Advil, Motrin 800 mg once every eight hours and Zyrtec, 10 mg once daily

(TR 521). On that occasion, Hensley reported that her back pain was significantly better after physical therapy and that she had lost 9 pounds since starting Adderall (TR 522). She also related a diagnosis of bipolar disorder adding that her psychiatrist was evaluating her for paranoid schizophrenia (Id.). Physical examination proved to be largely within normal limits. (TR 523).

She returned to Norton Healthcare for a medication refill on June 17, 2015 with a diagnosis of chronic back pain (TR 525-26). In addition to her existing medications, Hensley also was prescribed Seroquel, 50 mg, Adderall, 30 mg, and baclofen, 10 mg (TR 527). Hensley on that occasion expressed an interest in returning to physical therapy for her back pain explaining that "it helped significantly in the past." (TR 528). Once again physical examination results were essentially normal except for tenderness in the lumbar spine (TR 528-29).

Hensley also received treatment on various occasions at the emergency room of the U of L hospital (TR 338-386, 531-553). She received treatment for complaints of chronic back pain on October 4, 2013 (TR 377-386). Hensley appeared in no acute distress on that occasion and was calm and cooperative with a normal gait, heart rate and rhythm (TR 383). She was prescribed hydrocodone and Valium and was released on the same date with her condition noted to be improved and stable. She was instructed to apply alternating ice and heat to her back and to avoid prolonged sitting (TR 379). She also was advised to use Tylenol and Motrin or Advil to control her pain (Id.).

Records reflect that on October 20 and November 27, 2013, Hensley was treated by the U of L emergency department for a miscarriage and pelvic inflammatory disease, respectively (TR 338-349, 350-375). The following year on August 1, 2014 Hensley received treatment at the emergency psychiatric services of the University Hospital with a diagnosis of mood disorder and

PTSD (TR 551-553). Hensley complained on that date of depression and suicidal thoughts, but had no concrete plan for self-harm (TR 543). She related sleeping difficulties along with an overwhelming feeling of sadness, sleep disturbance and occasional visual hallucinations. (Id.). She also reported a prior medical history of schizophrenia and a prior suicide attempt (Id.). Psychiatric treatment notes indicate that Hensley had talked of recently attempting to get Seven County Services to diagnose her with schizophrenia after she read the symptoms of the disease on the webM.D. website online. (TR 535).

Nevertheless, Hensley appeared in no acute distress on examination. Her speech was within normal limits. Her affect appeared normal. She was noted to be calm and cooperative with good eye contact. (TR 544). She did not appear to be agitated and was not verbally threatening or combative. She appeared to be well-nourished, neat and clean with a normal gait and unlabored respiration (TR 544). Hensley was released from the ER on the same date in stable condition (Id.). Post-hearing supplied records from Seven Counties Services reflect a diagnosis of unspecified episodic mood disorder, attention deficit disorder with hyperactivity, and unspecified personality disorder (TR 554-566, 567-613).

Hensley in her hearing testimony agreed that her Adderall prescription worked for her and that she was comfortable with taking Adderall (TR 56-58). Whereas, Seroquel made her too sleepy and she was afraid of potential side effects from Risperdal. (Id.). At the time of the hearing, Hensley was taking only Adderall (TR 58). She further acknowledged that she voluntarily ceased treatment at Seven County Services for several months in 2015 after she became angry when her treating physician refused to increase the dosage of her Adderall (Id.). Hensley testified that she continues to experience visual and auditory hallucinations, which she described as being a peripheral light in her eyes or a "beep" sound (TR 59). Hensley also

confirmed her travel to Houston, Texas during the summer of 2015 (TR 60). She denied , however, having any close friends or belonging to any social groups (TR 62). She testified to being suspicious of other people, but acknowledged that she had been in relationships and had a boyfriend, Jaquay Shavaz, prior to her travels to Texas (TR 63, 67).

Hensley testified that she can sit comfortably for 20 or 30 minutes on a good day and can walk "around the corner and back." (TR 63-64). She explained she does not sit and that she can stand less than she can sit (TR 64). Hensley described her pain level as being 8 out of 10 on the pain scale (TR 65). She does not try to cook. (Id.). Hensley still keeps in touch with her sister and her nephew despite having conflicts with her sister in their early years (TR 70-71).

Vocational Expert (VE) Robert Piper testified that assuming Hensley's age, education and a residual functional capacity to perform a limited range of medium work with various non-positional limitations to avoid extreme cold, moderate vibration, unprotected heights and dangerous moving machinery, there would be a significant number of medium, unskilled jobs that Hensley could perform such as packager, order filler and stock clerk (TR 73-74). Such jobs in Piper's opinion could be performed with a sit/stand option, but all work would be eliminated if Hensley needed to lay down for an hour during the weekday (TR 74). Likewise, if she would be off task for 5 to 10 minutes, two or three times each work day, then all competitive work also would be eliminated. (TR 75).

## II.
## The Listing of Impairments

We begin with Hensley's argument that ALJ Price erred in finding of fact no. 4 of his hearing decision when he determined that she does not have an impairment or combination of impairments that meets or medically equaled the severity of any of the listed impairments of 20

CFR Part 404, Subpart P, Appendix 1. (TR 17-19). In his decision, the ALJ considered both the listings for Musculoskeletal Systems, Listing 1.00 and the Listing for Mental Disorders, Listing 12.00. (TR 17). He additionally took into consideration Hensley's documented obesity in determining whether her medically determinable impairments were severe and whether they met or equaled any listing in accordance with SSR 02-1p. In particular, ALJ Price considered Listings 12.02, 12.03, 12.04, 12.06 and 12.08. (TR 18). He concluded upon examination of the "paragraph B" criteria that Hensley had only mild restrictions in her activities of daily living, moderate difficulties in her social functioning, along with moderate difficulties in her concentration, persistence or pace. (Id.). Accordingly he concluded that she failed to meet the criteria of any of the above Listings which require at least two market restrictions, or one marketed limitation with repeated episodes of decompensation, of which there were none.

Hensley appears to take issue generally with the ultimate conclusion that none of her severe impairments alone, or in combination, satisfied any of the Listings considered by the ALJ in his decision. She does not inform the Court, however, which of her severe impairments, alone or in combination with another, satisfies the criteria of which particular Listing. In other words, she simply disagrees with the conclusion of the sequential evaluation process at step three without offering any meaningful detail of the basis for her disagreement.

The claimant bears the burden at step three of the analysis to show a severe impairment that is either permanent or expected to result in death as well as show that her condition meets or equals all of the criteria of at least one of the listed impairments. *Listenbee v. Sec. of HHS,* 846 F.2d 345, 350 (6th Cir. 1988); *Land v. Secretary of HHS,* 814 F 2d 241, 245 (6th Cir. 1986); *Rosic v. Comm'r of Soc. Sec.*, NO. 1:09CV1380, 2010 WL 3292964 at *3 (N.D. Ohio Aug 19, 2010)( "At the third step in the disability evaluation process, a claimant will be found disabled if

her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The claimant bears the burden of proving every element of the listing.")(citing *King v. Sec'y Health & Human Servs*., 742 F.2d 968, 974 (6th Cir.1986)). A claimant can demonstrate that she is disabled because her impairments are equivalent to a listed impairment by presenting "medical findings equal in severity to all the criteria of the most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Foster v. Halter,* 279 F 3d 348, 355 (6th Cir. 2001).

Because Hensley does not identify which of her severe impairments supposedly meets or equals all of the criteria of any particular Listing of Appendix 1, she cannot successfully argue that the ALJ erred. It is Hensley's burden to put forward before the Court that evidence that she maintains satisfied the criteria of a particular Listing and to explain how that evidence was either overlooked or improperly interpreted by the ALJ. She has not done so in any fashion and we are not required to construct such an argument for her. *See Kennedy v. Comm'r*, 87 Fed. Appx. 464, 466 (6th Cir. 2003)("[I]ssues which are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Baldwin v. Astrue*, case no. 08-395, 2009 WL 4571850 at *3 (E.D. Ky. Dec. 1, 2009)("The Plaintiff is represented by counsel and the Court is not required to formulate arguments on the Plaintiff's behalf.").

When a claimant in a social security case fails to make a particularized argument in support of an assertion of error, the Sixth Circuit has held that the Court need not devise arguments for the plaintiff, nor engage in an open-ended review of the entire record to make an independent determination of a possible basis for an undeveloped claim of error. *See Hollon, ex rel. v. Comm'r of Soc. Sec.,* 447 F.3d 477, 491 (6th Cir. 2006) (Where claimant suggested that the ALJ failed to give proper deference to the opinion of his treating physician, but did not

identify any specific opinion, the court declined to "broadly scrutinize any and all treating physician's opinions in the record to ensure that they are properly accounted for in the ALJ's decision."); *Marida v. Astrue*, 737 F. Supp.2d 674, 679 n.2 (E.D. Ky. 2010) ("In failing to direct this court's attention to the medical findings or opinions the ALJ allegedly disregarded, or in what manner the ALJ's RFC was impermissibly inconsistent with the assessment of the plaintiff's treating and examining physicians, plaintiff's argument lacks the specificity required by this court on appeal."). *See also, Works v. Astrue*, Case No. 3:09-CV-50DCR, 2010 WL 4510915 at *4 (E.D. Ky. Nov. 1, 2010) ("The court is not obligated to develop arguments for a claimant or engage in a fishing expedition for evidence to support the claimant's position.") (citing *Hollon*, 447 F.3d at 491). Accordingly, based upon the above cited case law, the Court declines to further address Hensley's undeveloped argument with respect to finding of fact no. 4.

### III.
### Treating Medical Source

The above-cited case law also puts to rest Hensley's second argument that ALJ Price erred when he violated the "treating source" rule as set forth in SSR 96-2p and 20 CFR § 404.1572. Hensley generally claims that the ALJ did not determine which of her doctors falls within the category of a treating medical source, nor did the ALJ discuss in his hearing decision whether any such doctor(s) rendered a favorable opinion entitled to controlling weight, to include her GAF scores. Hensley, however, does not share with the Court which of the medical providers she believes to be a treating medical source, whose opinion would be entitled to controlling weight if sufficiently detailed and fully supported by the record. Indeed, Hensley does not even identify what, if any, favorable opinion is to be found in the record that was not

given sufficient weight by ALJ Price.  As the Commissioner points out, the record does not appear to contain such an opinion, and our own independent review has failed to find one.

The earlier cited *Hollon* and *Marida* decisions put an end to this aspect of Hensley's second argument without further discussion due to its lack of specific development. *See Hollon, ex rel. v. Comm'r of Soc. Sec.,* 447 F.3d 477, 491 (6th Cir. 2006) (Where claimant suggested that the ALJ failed to give proper deference to the opinion of his treating physician, but did not identify any specific opinion, the court declined to "broadly scrutinize any and all treating physician's opinions in the record to ensure that they are properly accounted for in the ALJ's decision."); *Marida v. Astrue*, 737 F. Supp.2d 674, 679 n.2 (E.D. Ky. 2010) ("In failing to direct this court's attention to the medical findings or opinions the ALJ allegedly disregarded, or in what manner the ALJ's RFC was impermissibly inconsistent with the assessment of the plaintiff's treating and examining physicians, plaintiff's argument lacks the specificity required by this court on appeal.").

As for her reference to the GAF scores of record, Hensley concedes that such scores are at best subjective snapshots in time that the Commissioner is not required to endorse. *Lee v. Comm'r*, 529 Fed. App'x. 706, 716 (6th Cir. 2013); *Johnson v. Comm'r*, 535 Fed. App'x. 498, 508 (6th Cir. Oct. 13, 2013).  Further, the GAF scores of record do not come from "acceptable medical sources" as the term is defined by 20 CFR § 404.1502.  Rather, the two GAF scores are those of a clinical psychologist, Greg Lynch, PhD, acting as a state agency consultative examiner, who assessed a GAF of 58 in September 2013 (TR 331), and that of a clinical social worker, Emily Hill, who assessed a GAF of 43 in February 2014 (TR 410, 418, 485, 578).

Because a non-examining psychologist and a clinical social worker are not "acceptable medical sources" under the regulation, ALJ Price was not required to treat their subjective GAF

scores as being the equivalent of controlling opinions by a treating medical source. *See Garcia v. Astrue*, 10 F. Supp.3d 282, 296 (N.D. N.Y 2012)( "A 'treating source' is defined as the claimant's "own physician, psychologist, or other acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [claimant]." 20 C.F.R. § 404.1502; *Miller v. Comm'r*, 811 F.3d 825, 838 (6th 2016)(licensed social worker was not an acceptable medical source under the regulation); *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011)("The agency's regulations limit treating sources to "acceptable medical sources," 20 C.F.R. § 404.1502, the definition of which does not include mental health counselors such as Ms. Dailey, 20 C.F.R. § 404.1513(a).").   Accordingly, even on its merits, Hensley's treating medical source opinion argument fails as it relates to GAF scores since neither of the two individuals involved is a treating medical source.

## IV.
## Disputed Factual Findings

Hensley in the final portion of her Fact & Law Summary challenges the findings of ALJ Price in two separate respects.  As noted, she insists that the ALJ erred at page 10 of his hearing decision (TR 23) to the extent that he "found that she had not been hospitalized for her mental health issues when in fact Hensley had been involuntarily admitted to the hospital on August 1, 2014 following a suicide attempt."  (DN 16, FL&S p. 9).  Second, Hensley maintains that the ALJ characterized her hearing testimony in a misleading fashion when he stated in his decision at page 11 (TR 24) only that Hensley "testified that she has not been able to fit the [physical therapy] sessions into her schedule," when a proper characterization of the record would have

revealed that the side effects of her psychotropic medications made her too sleepy to attend her morning physical therapy treatments (Id.).

The Court has considered both arguments neither of which has substantial merit. Hensley was not involuntarily hospitalized on August 1, 2014 contrary to her assertions. Examination of the administrative record reveals that Hensley, who was despondent and experiencing mood swings following a romantic breakup, was brought to emergency psychiatric services department at the University of Louisville at 12:11 p.m. on that date. She denied suicidal or homicidal ideation upon arrival and was not admitted to the hospital (TR 534-535).

Mental status examination revealed Hensley to be alert, with congruent affect, fluent speech, fair judgment and normal attention span. (TR 538). She was discharged in stable condition on the same date at 4:39 p.m. with instructions to follow up at Seven County Services. (TR 544-545). Accordingly, the hearing decision of ALJ Price correctly summarizes what occurred on that date.[3]

We likewise see nothing misleading in the ALJ's hearing decision to the extent that he found that Hensley "testified that she had not been able to fit the [physical therapy] sessions into her schedule." (TR 24). Hensley did indeed testify that she had not found a way to fit physical therapy into her schedule (TR 42). Hensley added by way of explanation that, in the past, there had been times that, due to her medication, she had overslept her prior physical therapy sessions, despite her acknowledgment that she did receive significant benefit from them. (TR 42). Thus, at worst, the ALJ simply omitted from his hearing decision Hensley's own explanation for why she could not fit further physical therapy sessions into her schedule. Such an omission is nothing

---

[3] More specifically, the ALJ wrote that "in August 2014, the claimant sought crisis intervention after expressing thoughts of suicide and having crying episodes after finding out her significant other had another girlfriend. Despite reports of rapidly changing emotions with rapid speech and sad mood, and somewhat labile/histrionic affect, the claimant remained largely goal directed in her thinking and was stable upon same-day discharge." (TR 23).

more than harmless error at most. *See, Coleman v. Comm'r,* 693 F.3d 709, 714 (6th Cir. 2012)

(error of fact in credibility determination of the ALJs hearing decision was harmless); *Despins v.*

*Comm'r,* 257 Fed. App'x. 923, 931 (6th Cir. 2007) (misinterpretation of hearing testimony by

ALJ considered to be harmless error).

Here, the Commissioner carried her burden at step five of the sequential evaluation

process. ALJ Price presented the vocational expert during the hearing with a hypothetical that

accurately related Hensley's age, education, lack of prior work experience and her residual

functional capacity for a limited range of medium work. (TR 73). With that information,

vocational expert Piper identified alternative work that Hensley remained capable of performing

in jobs such as hand packager, order filler and stock clerk. (TR 27, 73-74).

The testimony of a vocational expert, such as VE Piper, may be substantial evidence to

support the decision of the ALJ if that testimony is made in response to a hypothetical question

that accurately portrays the mental and physical impairments of the claimant. *Ealy v. Comm'r*,

594 F.3d 504, 512-13 (6th Cir. 2010) (citing *Varley v. Sec'y*, 820 F.2d 777, 779 (6th Cir. 1987)).

The hypothetical question to the V.E. is not required to include a list of all the claimant's

medical conditions. *Wadd v. Comm'r*, 368 F.3d 629, 632-33 (6th Cir. 2004). The hypothetical

question also need not incorporate those limitations asserted by the claimant that are properly

rejected by the ALJ based on his independent review of the record. *Foster v. Halter*, 279 F.3d

348, 356-57 (6th Cir. 2002). The ALJ also may present a hypothetical to the V.E. on the basis of

the ALJ's assessment of the claimant's credibility. *Jones v. Comm'r*, 336 F.3d 469, 475-76 (6th

Cir. 2003) (citing *Townsend v. Sec'y*, 762 F.2d 40, 44 (6th Cir. 1985)). Because the hypothetical

presented by ALJ Price accurately portrayed Hensley's limitations, and because the VE

identified a significant number of alternative jobs that Hensley remains capable of performing in

the national economy, the decision of the Commissioner will be affirmed by separate order and the complaint dismissed with prejudice.

Cc:     Counsel of Record